IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,                       No. 2:08-CR-00093-KJM

    v.

LEONARD BERNOT,

        Defendant.                    <u>ORDER</u>

_____/

        As requested by the parties, the court issues the following findings based on the three-day evidentiary hearing held October 1, October 17 and October 25, 2013. *See* FED. R. CRIM. P. 32(i)(3). Throughout the hearing, Assistant United States Attorneys Michael D. Anderson and Matthew G. Morris appeared for the government, while Bruce Locke appeared for defendant Leonard Bernot.

        As set forth below, the court finds: (1) Mr. Bernot's "relevant conduct" is limited to the transactions with Laura Merchant, Terrylynn Walker,[1] Brenda Diller and Ted and Shari Garfinkle (collectively "homeowners"); (2) Mr. Bernot did not defraud Merchant, Walker or Diller but did defraud the Garfinkles; (3) Mr. Bernot employed "sophisticated means";

/////

---

[1] At the time of the evidentiary hearing, Ms. Walker had a new last name, Youpele.

1

(4) Mr. Bernot accepted responsibility; (5) Mr. Bernot targeted a "vulnerable victim"; and (6) Mr. Bernot did not obstruct justice.

I.     BACKGROUND

In February 2008, Mr. Bernot was indicted, along with sixteen codefendants, on various charges stemming from involvement with Head Financial Services ("HFS"), an enterprise targeting homeowners in financial distress. Indictment 24:3, ECF No. 1 (sealed). The superseding indictment charged conduct from January 1, 2004 to March 14, 2006. Superseding Indictment 2:3–4, ECF No. 303. In April 2008, Mr. Bernot entered a plea of not guilty on all counts, Arraignment Minutes, ECF No. 109, and the court eventually set a trial date of July 11, 2011, Status Conference Minutes, ECF No. 428. In June 2011, at the trial confirmation hearing, following unsuccessful negotiations and without any agreement with the government, Mr. Bernot changed his plea to guilty as to count one of the superseding indictment; count one charges conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349. Change of Plea Hr'g Minutes, ECF No. 459.

At the plea colloquy, defense counsel read into the record the factual basis to support Mr. Bernot's plea. That basis reads as follows:

> [Mr.] Bernot . . . admits that in or about October of 2004 [he] applied for first and second loans secured by a residential real property located at 1098 Upper Happy Valley Road, Lafayette, Contra Costa, California.
>
> In that application, [Mr. Bernot] falsely stated that he was purchasing the property for $1,200,000 when, in fact, he knew that he was purchasing the home for substantially less than $1,200,000. And therefore, this statement was untrue.
>
> [Mr. Bernot] supplied this application to [codefendant and owner of HFS] . . . Charles Head [("Head")] to provide to the lender. . . . Head knew that the actual purchase price was substantially less than $1,200,000. . . . Head supplied the application to the lender.
>
> This statement of the purchase price was material to the lender, and as a result of this material false statement the lender funded both of the loans.
>
> [Mr. Bernot] caused the lender to use the United States mails to transfer loan documents to and from the escrow

> company that closed the loans as part of the scheme to obtain
> loans by the making of false representations to the lender.

Plea Colloquy Tr. ("Plea Tr.") 15:6–25, ECF No. 908.

The government disputed the factual basis, arguing the facts underlying the count as charged were "different and more expansive." *Id*. 16:12–13. Nonetheless, without "adopt[ing] or agree[ing] or stipulat[ing]" to Mr. Bernot's version of the facts, the government stated that the basis, as articulated, "[met] the basic elements of the offense" and was thus "sufficient for the court to take the plea." *Id.* 16:14–17. Agreeing that the facts supported the essential elements of the charged offense, the court accepted the plea, adjudged Mr. Bernot guilty and referred the matter to probation for preparation of a presentence investigation report ("PSR"). *Id.* 18:8–20.

The draft PSR issued in August 2012 and the final version in June 2013. ECF No. 788. Both parties filed objections, Def.'s Letter of Objection, ECF No. 788-1; Gov't's Letter of Objection, ECF No. 788-2, and requested an evidentiary hearing, Stipulation and Proposed Order for Evidentiary Hr'g at 1, ECF No. 843.

II.    STANDARD

"Ordinarily, a district court uses a preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud." *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010) (citing *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008)). In certain cases, "'where an extremely disproportionate sentence results from the application of an enhancement, the government may have to satisfy a "clear and convincing" standard.'" *Id.* (quoting *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007)). However, even where a significant enhancement results, "sentencing determinations relating to the extent of a criminal conspiracy need not be established by clear and convincing evidence." *Id.* (citations omitted) (rejecting clear-and-convincing standard where loss amount due to extent of conspiracy resulted in twenty-two level increase in Guidelines range). "[S]entencing enhancements based entirely on the extent of the conspiracy do not require the heightened standard of proof." *Armstead*, 552 F.3d at 777 (citing *United*

/////

*States v. Riley*, 335 F.3d 919, 926–27 (9th Cir. 2003); *United States v. Harrison-Philpot*, 978 F.2d 1520, 1524 (9th Cir. 1992)).

      Additionally, the Federal Rules of Evidence do not apply to sentencing proceedings. *United States v. Christensen*, 732 F.3d 1094, 1102 (9th Cir. 2013) (citing FED. R. EVID. 1101(d)(3)). Instead, "the judge has broad discretion as to the sources and types of information relied upon." FED. R. EVID. 1101(d)(3) advisory committee's note (1972) (citing *Williams v. New York*, 337 U.S. 241, 246 (1949)); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of a offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

III.    FINDINGS OF FACT

      The following findings are based on evidence proffered during the hearing. In so finding, the court relies only on evidence it deems credible. Objections to exhibits are noted. However, they go to weight, not admissibility. *See Christensen*, 732 F.3d at 1102; FED. R. EVID. 1101(d)(3); 18 U.S.C. § 3661.

    A.  Relevant Conduct

        i.  Profits

1. While at HFS, Mr. Bernot worked as an independent contractor and filed a 1099 form for tax purposes. Evidentiary Hr'g Tr. ("Tr.") 283:22–284:1, ECF Nos. 868, 878, 879.
2. Mr. Bernot worked as a sales agent. *Id.* 288:13–15.
3. Mr. Bernot was paid on a commission basis. *Id.* 283:25–284:20.
4. For foreclosure transactions, Mr. Bernot and Head split proceeds fifty-fifty. *Id.* 288:5–9.
5. Head split foreclosure proceeds in the same manner with all sales agents at HFS. *Id.* 288:8–15.
6. Head also split costs with sales agents in the same manner. *Id.* 288:16–23.
7. Mr. Bernot received proceeds from the Walker, Merchant, Diller and Garfinkle transactions. *Id.* 161:1–5, 287:22–288:12; Def.'s Post Evidentiary Hr'g Br. ("Br.") at 3.

4

### ii. Cooperation & Interdependence

8. HFS began to focus on foreclosures at approximately the same time that it began to operate out of its Costa Mesa, California location. Tr. 135:21–136:20.

9. For a period in 2004, Mr. Bernot and some codefendants worked from the same location in Costa Mesa. *Id.* 286:18–287:15, 346:19–347:3, 352:10–353:2.

10. Mr. Bernot had an office, shared only with his assistant, in the Costa Mesa location. *Id.* 136:21–137:12.

11. Mr. Bernot and some codefendants attended at least one meeting together. *Id.* 147:22–23, 174:4–19.

12. Mr. Bernot and some codefendants relied on the same support staff, namely the loan processors. *Id.* 346:6–347:9.

13. Head paid for the support staff. *Id.* 158:21–22, 346:6–347:9.

14. Head paid for the office space. *Id.* 158:19–20, 346:6–13.

15. Mr. Bernot and codefendants mailed postcards to solicit business. *Id.* 142:1–13, 292:4–6.

16. The postcards were coded by sales agent to permit the sales agents to coordinate mailings with each other. *Id.* 148:4–149:1.

### iii. Length & Depth of Involvement

17. Mr. Bernot began working for Head in or about 2000. *Id.* 283:8–17, 286:10–14.

18. Mr. Bernot worked with Head on HFS's first equity purchase transaction in or about 2003; that transaction involved a postal worker who delivered mail to the office and asked for help. *Id.* 289:25–290:22, 380:6–21.

19. Head formulated the foreclosure business idea. *Id.* 159:20–22.

20. Mr. Bernot was not present at the initial meeting Head held concerning implementation of the foreclosure program. *Id.* 159:20–160:6, 291:17–292:3.

21. Mr. Bernot was a "team leader" at some point while working for HFS. Gov't's Sentencing Mem. ("Mem.") Ex. 25, ECF No. 853-3.

/////

22. As a "team leader," Mr. Bernot was expected to assist less experienced employees. Tr. 388:14–391:1.

23. As a "team leader," Mr. Bernot was entitled to an additional commission based on his team's performance. Mem. Ex. 25.

24. Mr. Bernot was never actually paid any commission for his role as a "team leader." Tr. 285:9–23.

25. Mr. Bernot served as a contact for new hires. *Id.* 391:20–392:9.

### B. Fraud

26. Joshua Coffman[2] falsely represented to the Garfinkles that Shari Garfinkle would remain on title after the transaction with HFS was completed. Mem. Ex. 75[3]; Tr. 152:23–153:10.

27. The Garfinkles did not interact with Mr. Bernot until after Coffman had completed the transaction with them. Tr. 56:1–7, 173:2–4.

### C. Sophisticated Means

28. Mr. Bernot's transactions involved the use of straw buyers, which he described as persons with good credit who could qualify for 100 percent financing. Mem. Ex. 2, ECF No. 853-1; Tr. 176:23–177:20, 188:22–189:22.

29. Mr. Bernot's transactions involved the use of separate corporate entities created at Head's behest and controlled by Mr. Bernot and his codefendants. Mem. Exs. 1, 2; Tr. 161:22–25, 213:16–18, 215:18–216:2, 243:20–24, 345:21–346:1.

/////

/////

/////

---

[2] Coffman, a former HFS employee and codefendant in this case, accepted a plea agreement and pleaded guilty to the same count at issue here. He subsequently testified in the evidentiary hearing as a cooperating witness on behalf of the government.

[3] The government has not filed this exhibit on the docket. A scanned copy will be filed concurrently with this order.

### D. Acceptance of Responsibility

30. Mr. Bernot pled guilty to count one of the February 11, 2010 indictment, conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349.  He pled within fourteen months of the issuance of the superseding indictment, without the benefit of a plea agreement at the time set for trial confirmation.  Plea Tr. 18:2–17.

### E. Vulnerable Victims

31. Mr. Bernot targeted homeowners in financial distress who had already received a notice of default.  Mem. Ex. 9, ECF No. 853-1; Tr. 140:15–141:10, 286:15–287:8.

### F. Obstruction of Justice

32. Ms. Merchant testified that Mr. Bernot did not inform her that he would take her name off title or take the equity out of her home.  Tr. 17:4–12.  She was equivocal about whether the signatures and initials on some documents, including one titled "Equity Purchase Agreement," were hers.  *Id.* 19:4-22:25, 32:10-36:9.

33. Ms. Walker testified adamantly that Mr. Bernot did not inform her that he would take her name off title or take the equity of her home.  *Id.* 105:7–11, 107:3–8.  On cross-examination, she identified her signature readily on documents, including a purchase agreement, but said she did not recall the contents.  *Id.* 111:3-115:3.

34. Ms. Diller testified that it was her understanding she would remain on title after completing her transaction with Mr. Bernot.  *Id.* 87:17–19.  She identified her signature and initials on documents as hers, but could not recall the contents of the documents or the circumstances of signing.  *Id.* 91:18-93:11.  She stated forthrightly, "I don't remember that far back."  *Id.* 93:5.

35. The government's case agent, IRS Special Agent Christopher Fitzpatrick testified that he prepared an investigatory report in July 2006; in the report he recorded his conclusions based on an interview he and another agent conducted with Mr. Bernot, perhaps telephonically.  *Id.* 228:1–6, 258:16–17.  The report includes the sentence: "[Mr.] Bernot claimed that he never informed homeowners that they would be taken off the deed."  Mem. Ex. 13, ECF No. 853-1.

36. Mr. Bernot making the statement to the agents; rather he testified that he "told everybody that they weren't going to stay on the title and they were going to lose their equity." Tr. 327:11-18, 349:12–14.

IV. ANALYSIS & CONCLUSIONS OF LAW

A. Relevant Conduct

Where the defendant has engaged in "jointly undertaken criminal activity," relevant conduct under the Sentencing Guidelines includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . ." U.S.S.G. § 1B1.3(a)(1)(B) (2013).[4] The court "may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that [(1)] fell within the scope of the defendant's agreement with his co-conspirators and [(2)] was reasonably foreseeable to the defendant." *Treadwell*, 593 F.3d at 1002 (citations omitted). Section 1B1.3 thus "*limit*[s] . . . what conduct may be considered in making the corresponding loss estimate for a conspiracy conviction . . . ." *Id.* at 1003 (emphasis in original) (citations omitted).

In circumscribing the scope of the "jointly undertaken criminal activity," the court may rely on a variety of factors. *Id.* at 1004–05 (citations omitted). The Ninth Circuit has approved consideration of comparative profits, as well as "whether [the defendants] 'worked together,' 'relied on one another . . . ,' attended the same sales meetings, and 'depended on the success of the . . . operation as a whole for their financial compensation.'" *Id.* (quoting *United States v. Blitz*, 151 F.3d 1002, 1013 (9th Cir. 1998)). As dictated by the facts, other factors may also include: length and depth of involvement in the conspiracy and

---

[4] The superseding indictment charges conduct from January 1, 2004 to March 14, 2006. Superseding Indictment 2:3–4. However, because the pertinent Guidelines provisions have not been modified since the indictment period and there are no *Ex Post Facto* Clause issues raised by doing so, the court cites the most recent version of the Guidelines for ease of reference.

8

1 representations thereof made to third parties, *id.* at 1004, and whether the defendant "helped
2 'design or develop' the scam, 'worked in any way to further the scheme outside his own sales
3 efforts,' 'furthered the objectives of the operation as a whole,' was paid on a 'pure commission
4 basis' as opposed to receiving 'profits of the overall operation,' and 'assisted other
5 representatives with their sales,'" *id.* at 1005 (quoting *United States v. Studley*, 47 F.3d 569,
6 576 (2d Cir. 1995)).

           i. <u>Profits</u>

8       Mr. Bernot concedes he received profits from the Merchant, Walker, Diller and
9 Garfinkle transactions. Tr. 287:22–288:12; Br. at 3–4. As a 1099 independent contractor, Mr.
10 Bernot was paid on a commission basis, and as was the general rule with foreclosure
11 transactions, Mr. Bernot split proceeds from the Merchant, Walker and Diller transactions fifty-
12 fifty with Head. Tr. 283:22–284:20, 288:5–9. For the Garfinkle transaction, because three
13 parties were involved—Mr. Bernot, Head and Coffman—each party received one-third of the
14 proceeds. *Id.* 161:1–5.

15       The government has not introduced evidence sufficient to establish either Mr.
16 Bernot's receipt of profits from other transactions or pooling of profits. Instead, the court finds
17 that, unless codefendants worked together directly, the profits of any one person were
18 independent of those of any other. Additionally, Mr. Bernot's profits must be considered
19 relative to those of other coconspirators. *See Treadwell*, 593 F.3d at 1005 (citation omitted).
20 Although the government seeks to attribute to Bernot losses from every transaction by Head or
21 one of his associates that was completed during the time period charged in the superseding
22 indictment, the evidence instead shows that Head is the only coconspirator to have participated
23 in and profited from every transaction. Tr. 146:12–16, 160:7–25, 288:5–12. To the extent an
24 "overall operation" existed, *Treadwell*, *supra*, Head was the only beneficiary of that operation.

25       This factor supports limiting the scope of Mr. Bernot's "jointly undertaken
26 criminal activity" to the Merchant, Walker, Diller and Garfinkle transactions.

27 /////
28 /////

ii. Cooperation & Interdependence

Mr. Bernot both cooperated with and depended on codefendants. He concedes he worked with codefendants on the Merchant[5], Walker, Diller and Garfinkle transactions. The court finds that to the extent they worked together, but only to that extent, codefendants' joint involvement was necessary to completion of the transactions.

The government has not introduced evidence to show by a preponderance of the evidence Mr. Bernot's meaningful participation in any other transaction. Although the government has shown that codefendants attended at least one meeting together, Tr. 147:22–23, 174:4–19, coordinated mailings, *id.* 148:4–149:1, worked out of the same location, *id.* 352:10–353:2, and relied on the same support staff, *id.* 346:6–347:9, this showing is insufficient to permit the court to hold Mr. Bernot responsible for losses attributable to other codefendants. *See Treadwell*, 593 F.3d at 1005; *see also Blitz*, 151 F.3d at 1013.

First, Coffman, a former HFS employee, testified there were "constant" status meetings because Head was always "stressed," yet he could only "recall [Mr. Bernot] being at one meeting." Tr. 147:9–148:3. This suggests Mr. Bernot s activity was generally separate from that of codefendants rather than critical to their success. Similarly, Mr. Bernot and codefendants coordinated postcard mailings; such coordination was in the interest of efficiently allocating their individual efforts, and does not, in context, support a conclusion that codefendants combined efforts to maximize profits.

Further, although Mr. Bernot and codefendants worked from the same location, most sales agents, including Mr. Bernot, had separate, enclosed offices within the space, shared with at most one other person. *Id.* 136:21–137:12. Propinquity alone is not proof of any particular scope of agreement. Finally, reliance upon the same support staff does not change the analysis here, as the staff was paid through Head's share of the proceeds, not Mr. Bernot's.

---

[5] At the same time, Mr. Bernot testified that it was Merchant's lawsuit against HFS that led him to retain his own counsel to review the documents developed by Head that Mr. Bernot was using; based on his attorney's review, and apparently after exhausting efforts to persuade Head to make changes, Mr. Bernot testified that he was "in the process of suing" Head. Tr. 323:9–325:15.

1  The relevant factors also support limiting the scope of Mr. Bernot's "jointly
2 undertaken criminal activity" to the Merchant, Walker, Diller and Garfinkle transactions.

### iii. Length & Depth of Involvement

According to his own testimony, Mr. Bernot helped to further the HFS operation as a whole and participated in ways beyond his own sales efforts. Mr. Bernot was involved with Head's mortgage operation from the first transaction, *id.* 289:25–290:10, 380:6–21, and was, at least at one point, a "team leader," Mem. Ex. 25. As a "team leader," Mr. Bernot was expected to assist less experienced employees, Tr. 388:14–391:1, and was at least entitled to an additional commission based on his team's performance, Mem. Ex. 25. Aside from his direct sales and marketing efforts, Mr. Bernot also served as a contact for new hires. Tr. 391:20–392:9. Although these actions were not critical to the success of the operation as a whole, they nonetheless furthered the HFS operation in a measureable way.

At the same time, the testimony of both Coffman and Mr. Bernot establishes that the foreclosure business was Head's own idea and Mr. Bernot was not present at the initial meeting to discuss implementation. Tr. 159:20–160:6, 291:17–292:3. Additionally, the government's exhibit showing Mr. Bernot as a "team leader" is undated and thus of limited value without other evidence to clarify the context. Mem. Ex. 25.

This factor weighs marginally against limiting the scope of Mr. Bernot's "jointly undertaken criminal activity" to only the Merchant, Walker, Diller and Garfinkle transactions.

### iv. Conclusion

In sum, although length and depth of involvement weigh somewhat against limiting the scope of Mr. Bernot's "jointly undertaken criminal activity" to only four transactions, all other factors support a limitation. On the totality of the record before the court, the government has not carried its burden of showing, by a preponderance of the evidence, that Mr. Bernot's relevant conduct extends beyond the Merchant, Walker, Diller and Garfinkle transactions. As a result, no sentencing enhancement for number of victims should be imposed. *See* U.S.S.G. § 2B1.1(b)(2)(A)–(C). However, due to Mr. Bernot's large-scale use of

11

postcards, Tr. 142:1–13, 148:4–149:1, 292:4–9, an enhancement for mass marketing is proper. U.S.S.G. § 2B1.1(b)(2)(A).

      B.  Fraud Against Homeowners

Fraud occurs when a defendant "obtain[s] money or property by means of false or fraudulent pretenses, representations or promises . . . ." 18 U.S.C. § 1341. The government argues Mr. Bernot defrauded not only lenders but also homeowners by falsely telling them they would remain on title and retain equity in their homes when he knew the contrary to be true. Mem. at 11.

Although Mr. Bernot's testimony at hearing was at times inconsistent, the homeowners' testimony was equally inconsistent and often conflicted with the documentary evidence. *Compare* Tr. 11:7–129:21, *with* Def. Exs. B, H, J.[6] Mr. Bernot's counsel correctly chronicles inconsistencies in the testimony of Walker, Diller and Merchant. Def.'s Reply Br. at 9–10, ECF No. 884. Many of the inconsistencies, particularly in the homeowners' testimony, may be explained by the passage of time. The inconsistencies in the homeowners' testimony is problematic however, because despite the voluminous documentary record, their testimony is the government's primary evidence of Mr. Bernot's purported fraud. The government's documentary evidence is, on the record as a whole, equivocal. *See, e.g.*, Mem. Exs. 13, 20, 47, ECF Nos. 853-2, 853-3. With only one exception, the court is unable to find that the government has met its burden.

The exception is the Garfinkle transaction. Mr. Bernot concedes Coffman falsely promised the Garfinkles that Shari Garfinkle would remain on title. Br. at 5 (citing Mem. Ex. 75); *see also* Tr. 152:23–153:10. Given the finding above that the Garfinkle transaction falls within Mr. Bernot's relevant conduct, the court finds any fraud attributable to Coffman in conjunction with this transaction to both "[fall] within the scope of the defendant's agreement with his co-conspirators and [be] reasonably foreseeable to the defendant." *Treadwell*, 593 F.3d at 1002 (citations omitted). Thus, Mr. Bernot may be held culpable for the

---

[6] Mr. Bernot has not filed these exhibits on the docket. Scanned copies will be filed concurrently with this order.

12

1  fraud Coffman perpetrated on the Garfinkles.  The government has made no such showing of
2  homeowner fraud with respect to Head, Mr. Bernot's coconspirator in the Walker, Diller and
3  Merchant transactions.
4          Accordingly, the court finds Mr. Bernot did not defraud Walker, Diller or
5  Merchant, but finds he did defraud the Garfinkles.

        C. <u>Sophisticated Means</u>

        A sentencing enhancement is proper where the defendant's "offense . . . involved sophisticated means . . . ."  U.S.S.G. § 2B1.1(b)(10).  "Sophisticated means" refers to "especially complex or . . . intricate offense conduct pertaining to the execution or concealment of an offense," including "hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells . . . ."  U.S.S.G. § 2B1.1 cmt. n.9(B).

        Mr. Bernot concedes that, in defrauding lenders, he concealed the true nature of the transactions in which he and the homeowners were engaged.  Plea Tr. 15:11–21.  Further, these fraudulent transactions involved straw buyers and the creation of multiple corporate entities.  Mem. Exs. 1, 2; Tr. 161:22–25, 176:23–177:20, 188:22–189:22, 213:16–18, 215:18–216:2, 243:20–24, 345:21–346:1.  Thus, in "hiding assets or transactions . . . through the use of fictitious entities [or] corporate shells," Mr. Bernot engaged in behavior that the Guidelines specify as constituting use of sophisticated means.

        The court finds that Mr. Bernot employed sophisticated means.  An enhancement is thus proper under U.S.S.G. § 2B1.1(b)(10).

        D. <u>Acceptance of Responsibility</u>

        A sentencing reduction is proper where a defendant "clearly demonstrates acceptance of responsibility for his offense . . . ."  U.S.S.G. § 3E1.1(a).  "In determining whether a defendant qualifies [for this reduction] . . . , appropriate considerations include . . . truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable . . . ."  *Id.* cmt. n.1(A).  "[A] defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction . . . .  A

13

defendant may remain silent in respect to relevant conduct beyond the offense of conviction . . . ." *Id.*

Here, Mr. Bernot pled guilty to conspiracy to commit mail fraud and relied on a factual basis the government conceded was sufficient to support the court's acceptance of the plea. Plea Tr. 15:6–18:7. The government has not shown that Mr. Bernot "falsely den[ied] any additional relevant conduct for which . . . [he] is accountable . . . ." U.S.S.G. § 3E1.1 cmt. n.1(A). Although the court finds Mr. Bernot responsible for defrauding the Garfinkles, this is based on Coffman's conceded fraudulent conduct, which Mr. Bernot did not "falsely deny." As discussed above, the record does not conclusively support a finding that Mr. Bernot himself represented to homeowners that they would remain on title. Thus, Mr. Bernot need not have accepted responsibility for doing so.

The court finds that Mr. Bernot has accepted responsibility, in that his guilty plea qualifies him for the two-level reduction under U.S.S.G. § 3E1.1(a).[7]

### E. Vulnerable Victims

A sentencing enhancement is proper where "the defendant knew or should have known that a victim of the offense was a vulnerable victim . . . ." U.S.S.G. § 3A1.1(b)(1). A vulnerable victim is "a person . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* cmt. n.2. Such "victims . . . are those who are in need of greater societal protection. They are the persons who, when targeted by a defendant, render the defendant's conduct more criminally depraved." *United States v. Castellanos*, 81 F.3d 108, 111 (9th Cir. 1996) (citations omitted).

/////

/////

---

[7] The government's argument regarding the timeliness of Mr. Bernot's guilty plea is pertinent only to an additional one-level reduction available for "assist[ing] authorities . . . [and] thereby permitting the government to avoid preparing for trial" under U.S.S.G. § 3E1.1(b). As Mr. Bernot argues only for the basic two-level reduction for "accept[ing] responsibility" under U.S.S.G. § 3E1.1(a), Def.'s Reply Br. at 12, the court rejects this argument.

14

1       The government argues that the homeowners were vulnerable victims.
2  However, as discussed above, the court finds that Walker, Diller and Merchant are not victims
3  of Mr. Bernot's criminal conduct.
4       Regarding the Garfinkles, the court finds they are properly considered
5  vulnerable victims. Although Coffman directly perpetrated the fraud, Mr. Bernot knew or
6  should have known the victims' characteristics because he was working closely with Coffman
7  and eventually interacted directly with the Garfinkles. Further, the HFS working protocol was
8  to target homeowners in financial distress who had already received a notice of default. Mem.
9  Ex. 9. Because financial distress renders a consumer particularly susceptible to fraud, the
10 enhancement is proper. *See United States v. Peters*, 962 F.2d 1410, 1416–18 (9th Cir. 1992)
11 (holding vulnerable-victim enhancement proper where defendant targeted those with credit
12 problems in credit card fraud scheme).
13      The court finds that Mr. Bernot targeted a vulnerable victim, and the
14 enhancement under U.S.S.G. § 3A1.1(b)(1) is proper.
15      F.   Obstruction of Justice
16      A sentencing enhancement is proper where "(1) the defendant willfully
17 obstructed or impeded, or attempted to obstruct or impede, the administration of justice with
18 respect to the investigation, prosecution or sentencing of the instant offense of conviction, and
19 (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant
20 conduct; or (B) a closely related offense . . . ." U.S.S.G. § 3C1.1. Such conduct includes
21 "committing, suborning, or attempting to suborn perjury," *id.* cmt. n.4(B), and "providing
22 materially false information to a judge," *id.* cmt. n.4(F).
23      The government argues Mr. Bernot committed obstruction because he perjured
24 himself by testifying under oath that he told homeowners they would neither stay on title nor
25 retain their equity. In light of the inconsistent homeowner testimony discussed above,
26 however, the government has not shown by a preponderance of the evidence that Mr. Bernot's
27 actions belied his in-court statements. The court does not entirely discount the government's
28 investigative report, which says Mr. Bernot claimed during a telephonic interview he did not

inform homeowners they would be taken off the deed.  Mem. Ex. 13 at 2.  But because the statement is not backed by a tape recording or signed written statement, the court finds it does not on balance assist the government in satisfying its burden.  The claim of perjury fails.

The court does not find that Mr. Bernot obstructed justice.  No corresponding enhancement is warranted.

V.     CONCLUSION

As set forth above, the court finds: (1) Mr. Bernot's "relevant conduct" is limited to the Merchant, Walker, Diller and Garfinkle transactions; (2) Mr. Bernot did not defraud Merchant, Walker or Diller but defrauded the Garfinkles; (3) Mr. Bernot employed "sophisticated means"; (4) Mr. Bernot accepted responsibility; (5) Mr. Bernot targeted a "vulnerable victim"; and (6) Mr. Bernot did not obstruct justice.

IT IS SO ORDERED.

DATED:  May 9, 2014.

_____
UNITED STATES DISTRICT JUDGE